IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 03-CR-30104-WDS |
| ) | |
| BENNIE L. THOMPSON , ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

**STIEHL, District Judge:**

This matter is before the Court on defendant's Motion to Suppress Evidence (Doc. 23) and Motion to Suppress Statements (Doc 24), to which the government has filed responses (Docs. 30 & 29, respectively). The Court held several days of hearings on the motions and the parties have filed post-hearing briefs.

## FACTUAL BACKGROUND

Early in the morning of March 3, 2004, a multi-force police task force conducted a search on a home and buildings located at or near 759 Cox Monument Road, Pocahontas, Illinois, pursuant to a search warrant issued by an Illinois state court judge of the Third Judicial Circuit. The defendant was subsequently indicted in this district on August 17, 2004, and charged with: Count 1, from July 4, 2003 to March 3, 2004, manufacture of 50 grams but less than 500 grams of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(viii); Count 2, possession on March 3, 2004, of equipment, products and materials used to manufacture methamphetamine, in violation of 21 U.S.C. § 843(a)(6); Count 3, possession of pseudoephedrine on March 3, 2004, with the intent to use the pseudoephedrine to

1

manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1); Count 4, possession on March 3, 2004, of weapons by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and Count 5, from on or about January 1, 2004, to on or about March 3, 2004, possession of a firearm during an in relation to a drug trafficking crime, all in violation of 18 U.S.C. § 924(c).

In his motion to suppress evidence, defendant contests the reliability of the information provided by the confidential informant. In addition, the defendant asserts that the warrant was overly broad, and allowed for the seizure of items for which there was no probable cause. At the hearings, the evidence revealed that the search warrant in question was based on the affidavit of Sergeant Detective Mike Dixon of the Madison County Sheriff's Department. The affidavit was, in part, based on information Dixon received from a Benjamin Howard, who Dixon knew had prior convictions. Howard indicated that he had stolen cold pills (which are regularly used in the preparation of methamphetamine) for the defendant, and that the defendant cooked methamphetamine ("meth"). Howard provided information from September of 2003 through the end of that year. The affidavit for the warrant indicated that there was also a confidential source, whom Dixon identified as Billy Patton. Dixon stated that in February of 2004, Patton met with Dixon and stated that he wanted to cooperate with law enforcement. Although Patton's prior criminal history was not part of the affidavit, the judge knew of his identity and would have been advised of Patton's history if he had asked Dixon about it.

Dixon indicated that the information Patton provided was corroborated through eight or nine separate reports. Dixon indicated that Patton gave information about stolen property which could be found on Thompson's premises, parts of a meth laboratory, and anhydrous tanks. Although no anhydrous tanks were found at the time of the search, Dixon testified that the

defendant later admitted that he was out of them at the time of the search. Dixon found a tank under Thompson's trailer that had contained anhydrous, but the tank was empty. The meth lab was in a shed that abutted the trailer.

Dixon also testified that Patton provided information about a shotgun and a chrome and black pistol that was on the premises. These items were found at the house, but the defendant said they belonged to his brother.

Dixon testified the second day of hearings that the search warrant provided for the search of the residence and the property in question, which included the trailer home itself, any attached sheds, dwellings, and other structures. There were a large number of officers involved because there were three simultaneous locations being searched, in Bond, Madison and Macoupin Counties.

Dixon detailed the nature of the *Miranda* warnings he gave to the defendant and his wife, Lisa Thompson, which included the right to remain silent; that evidence could be used against them in court; of their right to an attorney, and that one would be provided for them. He testified that after each of these things they acknowledged that they understood those rights. He stated that they both appeared in command of their faculties and that he made no promises to them. As Dixon walked the defendant out of the house, he asked for his cooperation because of the safety factors and reminded him of his rights. Dixon asked if the defendant had any anhydrous on the premises, to which he replied, "No." The defendant also indicated that he did not have an active lab at that time on the premises, but that whatever he had was in the detached metal shed to which he pointed. When asked if there were any stolen items, the defendant pointed to a few things on the property. Dixon had the defendant transferred to the Bond County Sheriff's

Department, and a copy of the search warrant was left in the home.

At approximately 2:30 P.M, Dixon went to the Bond County Sheriff's Department to talk with the defendant. Thompson informed the officers he wished to cooperate. He was again given his *Miranda* warnings by Dixon who used the MEGSI agency form. Also present were Detective Parkinson and Officer Utterbrink. S/A Heiser came in during the interview, and was introduced to the defendant as an ATF agent. S/A Heiser confirmed with the defendant that he had been read his *Miranda* rights and understood them. The defendant indicated that he wanted to cooperate, and even asked to be allowed to be released to act as an informant. Dixon advised him that he would not be used as an informant. The defendant showed them various drug activity locations in Bond and Macoupin Counties. Although the defendant asked for special favors, Dixon repeatedly advised him that no promises were being made to him, but that his cooperation would be passed along to the state's attorney.

Special Agent Paul Heiser, ATF, testified that he became involved in the search after the State Police found firearms at Thompson's residence. He participated in the questioning of the defendant, and although he came in about an hour after the interview had begun, he showed the defendant a copy of the signed *Miranda* waiver and asked Thompson about it, particularly whether he had read the form. S/A Heiser testified that Thompson did not appear to be under the influence of drugs or alcohol and was in possession of all of his faculties. S/A Heiser was there for the second advising of his rights which occurred at the Bond County Sheriff's Department. The defendant agreed to put his statement in writing. The majority of the questions were asked by Dixon, Heiser and Det. Mike Parkinson of the City of Granite City. Dixon wrote down defendant's statement.

Also on the second day of hearings, the government presented the testimony of Kelly Cullen, a Trooper with the Illinois State Police, who participated in the search of defendant's property.  Because it was believed that there were possibly drugs and weapons on the premises, the Tactical Response Team (TRT) was part of the search group.  The TRT gave the "all clear" and advised that a woman and children were in the residence.  Trooper Cullen spoke with the children and the woman.  They were not restrained.  The defendant was in the master bedroom at this time, and had been placed in flex cuffs.  Trooper Cullen patted down the adult female.  At that time, Agent Dixon advised the defendant and the adult female, identified as defendant's wife, of their *Miranda* rights.  Other officers were present, and Trooper Cullen stated that Dixon looked each of the Thompsons in the eye as he was explaining their rights and that the defendant and Lisa Thompson waived their rights.  Trooper Cullen also testified that Lisa Thompson did not appear to be under the influence of any narcotics or alcohol, nor did the defendant.  Dixon did not yell at the Thompsons or attempt to intimidate them in any manner. Although the execution of the search warrant began early, around 7:00 A.M., they were at the residence until approximately 3:00 to 4:00 P.M.  The children were taken by Special Agent Karen Gordon, of the Illinois State Police who works with endangered children.

Trooper Cullen was in charge of the evidence log that day.  As an item was identified and selected for seizure, Trooper Cullen would log it into evidence.  Some of the evidence seized included a handgun found in the master bedroom in a man's black leather jacket pocket.  There was also a shotgun retrieved from the shed.   In addition, components for the manufacture of methamphetamine were seized and logged.  This included things readily attainable, like coffee filters, hoses, containers, lithium batteries, plywood and tools.   The log indicates the person who

found the item and where it was located.

Detective Parkinson testified that he participated in the interview of the defendant which occurred at the Bond County Sheriff's Department. He witnessed the questioning by Detective Dixon, including the giving of the *Miranda* warnings. Parkinson testified that the defendant appeared to understand each of his rights and did not appear to be under the influence of alcohol or drugs. The defendant cooperated and did not ask for a lawyer. He also testified that the defendant was allowed to make telephone calls to his mother, his wife and his children.

Bond County Deputy Sheriff Steven Unterbrink, testified at the third day of hearings that he participated in the search of the defendant's residence, and that he saw the defendant in the front seat of another officer's vehicle having some sort of conversation. He did not overhear any of the conversation. He transported the defendant to the Bond County Sheriff's Department. Detective Manville, from the Highland Police Department, rode with them. On arriving at the Sheriff's office, the defendant was placed in a holding cell. Unterbrink escorted the defendant to the interview room where he saw Det. Dixon. He testified that he was not present for the reading of any *Miranda* rights to the defendant.

The defendant presented the testimony of several witnesses including defendant's brother, Ronald Thompson. Ronald Thompson testified at the fourth day of hearings that his father had left a shotgun at the defendant's residence and that he had never observed drug paraphernalia on the property

## **STANDARD OF REVIEW OF WARRANTS:**

A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe

that a search will uncover evidence of a crime." *United States v. Peck*, 317 F.3d 754, 755-56 (7th Cir. 2003) (*citing Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Where information from an informant is used to establish probable cause, the informant's credibility is assessed on the following: (1) whether the informant personally observed the events, (2) the degree of detail shown in the informant's statements, (3) whether the police independently corroborated the information, (4) the interval of time between the events and application for a warrant, and (5) whether the informant appeared in person before the judicial officer who issued the warrant. *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir.2002); *United States v. Jones*, 208 F.3d 603, 609 (7th Cir.2000).

     The Court **FINDS** that the affidavit presented in support of the state court warrant was not based on information provided solely by Patton, but was corroborated by several police investigative reports.  The Court notes that Patton volunteered information to law enforcement, but did not receive any promise or benefits from law enforcement.  Although Patton's information was not totally correct, in that some items were not found on the premises, this does not diminish the nature or credibility of the information he provided.  Rather, this is reflective of the nature of the business of drug manufacturing.  Patton's statements that anhydrous ammonia was kept by the defendant in a hollowed-out tree (none was found), and that the defendant always carried a gun (he did not have a gun on him at the time of his arrest) do not, as the defendant contends, make the affidavit suspect, nor warrant suppression of the evidence. Although the defendant was not carrying a gun at the time of the search, a handgun was found in the pocket of a leather jacket hanging on the wall in his bedroom.  Indeed, the defendant acknowledged that the gun was his.

A police officer violates the Fourth Amendment if he intentionally or recklessly submits untruthful statements in an affidavit used to obtain a search warrant, and a defendant may, in limited circumstances, obtain a hearing to challenge an allegedly false affidavit. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

Although the Court included a *Franks* inquiry as part of this motion to suppress, there is a presumption as to the validity of the affidavit supporting the search warrant which must be overcome by the defendant. *United States v. Souffrant*, 338 F.3d 809, 922 (7th Cir. 2003). To overcome this hurdle the defendant must provide evidence that the officers "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests." *Molina v. Cooper,* 325 F.3d 963, 968 (7th Cir. 1003) (*quoting Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir.2003)). "Immaterial misstatements will not invalidate an otherwise legitimate warrant." *Forman v. Richmond Police Dep't*, 104 F.3d 950, 964 (7th Cir.1997). And the standard is the same with respect to omissions. *See Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1441 (7th Cir.1994); *United States v. Williams*, 737 F.2d 594, 604 (7th Cir.1984).

Here, there simply is nothing in this record which would rise to the level of a proper *Franks* challenge to this warrant. There has been absolutely no showing that Det. Dixon "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer" to obtain the warrant. 325 F.3d at 968. Moreover, the search warrant was neither overly broad, nor did the items seized extend beyond the terms of the warrant. The Court, accordingly, **DENIES** defendant's motion to suppress evidence on all grounds.

## MOTION TO SUPPRESS STATEMENTS

In this motion the defendant asserts that the defendant was arrested and interrogated by law enforcement and was the subject of psychological and mental coercion, thereby making his statements involuntary. In part, his motion is based on the assertion that the officers confronted the defendant with evidence which had been seized in violation of his Fourth and Fourteenth Amendment rights, and were the result of direct and indirect promises from law enforcement offers of leniency, and that if he cooperated charges would be dropped. In light of the Court's ruling that there is no basis for suppressing the evidence based on challenges to the warrant, the defendant's motion on that ground must fail.

The Court **FURTHER FINDS** that the defendant was repeatedly given his *Miranda* warnings and that there is no evidence that there were any inappropriate promises or offers of leniency made to solicit the defendant's statement and cooperation. Indeed, the defendant's cooperation extended to offering to act as an informant and showing the officers where other drug operations were being conducted in several Illinois counties.

The Seventh Circuit has held that "[a] confession is voluntary if, in the totality of circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (*quoting United States v. Dillon*, 150 F.3d 754, 757 (7th Cir.1998)); *See also, United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004). "[C]oercive police activity is a 'necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *Huerta*, 239 F.3d at 871 (*quoting Colorado v. Connelly*, 479 U.S. 157,

167(1986)). Factors relevant to a determination that police conduct is coercive include "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.*

There simply is nothing in this record to indicate that the defendant's statement and other cooperation was based on anything other than a knowing and voluntary decision to cooperate with law enforcement after being given his *Miranda* warning.

Accordingly, the Court **DENIES** defendant's motions to suppress evidence and to suppress statements on all grounds.

**IT IS SO ORDERED.**

**DATED: February 8, 2006.**

                                                    **S/ WILLIAM D. STIEHL**
                                                      **DISTRICT JUDGE**